UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Nannette Hutchens,**  **Plaintiff,**  v.  **Capital One Services, LLC, Capital One Financial Corporation, and Capital One, National Association,**  **Defendants.** | CIVIL ACTION NO. 3:19-cv-546 |

# COMPLAINT

Plaintiff Nannette Hutchens respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

## Introduction

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon her termination signed a "Letter of Agreement" purporting to release her claims under ADEA. Plaintiff alleges that she was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program.  Plaintiff is entitled to keep her

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2. Plaintiff also asserts claims for declaratory relief that a specific provision of the Letter of Agreement is unenforceable such that Plaintiff will be permitted to pursue her OWBPA and ADEA claims on a collective basis without being in breach of such Agreement. Subject to Court's declaratory determination, if Plaintiff prevails on such declaratory claim, Plaintiff will move the Court to proceed on a collective action basis for relief pursuant to her OWBPA and ADEA claims. Plaintiff seeks declaratory relief to determine whether she may proceed with her claims on a collective basis, on behalf of others similarly situated pursuant to 29 U.S.C. § 216(b), without being in breach of her Letter of Agreement.

### Jurisdiction and Venue

3. This Court has jurisdiction for her ADEA claims pursuant to 29 U.S.C. § 216(b) in that the Plaintiff may bring this action in any appropriate United States District Court.

4. This Court has jurisdiction for declaratory judgment pursuant to 28 U.S.C. § 2201 in that the Plaintiff may bring this action in "any court of the United States."

5. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

6. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

**Parties**

7. Hutchens is a resident of Virginia who was employed by Capital One most recently as a Project Manager. Plaintiff was an "employee" as defined in the FLSA.

8. Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

9. Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

10. Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

11. On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent. Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants. Defendants are an "employer" as defined by the FLSA.

**Factual Allegations**

12. Hutchens was hired by Capital One in 2007 as a contractor and then converted to an associate in 2010.

13. Hutchens worked from Capital One's West Creek office complex in Goochland County, Virginia.

14. During the time frame relevant to this lawsuit, Hutchens worked as a Project Manager /Program Manager/ IT Delivery Lead for Capital One

15. Capital One has five categories for its performance evaluation ratings scale:

Exceptional, Very Strong, Strong, Inconsistent, Action Required.

16. Capital One informally refers to the five categories as five "buckets."

17. During Hutchens' employment with Capital One she consistently received performance evaluations in the Strong, Very Strong, or Exceptional buckets.

18. In October 2017, Capital One's Chief Information Officer (CIO), Rob Alexander, sent an email to all Capital One employees in the Technology department, approximately 9,000 employees including Hutchens, stating that Capital One was forcing managers to rank 12% of its employees as not meeting expectations in the next round of performance evaluations.

19. CIO Alexander stated in the email: "we will have a minimum of 12% of our associates in the Action Required and Inconsistent buckets combined."

20. In order for the Technology department to meet its minimum 12% mandate, some internal departments had a mandatory distribution slightly higher than 12%. For example, Hutchens' unit, Mosaic Tech, required its managers to rate 13% if its employees in the bottom two "buckets."

21. Alexander's email further required that those 12% of employees must be issued either "coaching plan" or "performance improvement plan" (PIP).

22. Upon information and belief, a sub-section of the aforementioned 12% was required to be involuntarily terminated.

23. CIO Alexander's email reflected changes in Capital One policies and practice:

    a. from a "performance management" distribution that was a "guide" or "aspirational" distribution of as low as 5% in the bottom two "buckets;" to a mandatory forced distribution of 12%;

    b. from requiring a "coaching plan" or PIP for only the Action Required

bucket; to now requiring a coaching plan or PIP for both Action Required and Inconsistent buckets;

24. Two more policy changes that went into effect were:

    a. Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

    b. Increasing Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

25. The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive. Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One, and the hiring managers had wide discretion to approve such transfers.

26. The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

27. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

28. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

29. Upon information and belief, Capital One required its managers to involuntarily terminate between one-half to two-thirds of the aforementioned 12% of those employees in the bottom two "buckets."

30. Hutchens worked in the chief of staff organization and worked closely with the individual who did resource planning for all of "Shared Tech."

31. Hutchens is aware that Capital One had specific targets for involuntary termination and they tracked those percentages.

32. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

33. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

34. In other words, this requirement under "Performance Management" that 12% of employees must be rated in the bottom two "buckets" and placed on "coaching plans" or PIPs, provided managers with the pool from which they would identify the ultimate target of "involuntary" terminations.

35. In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

36. This "Performance Management" policy of forcing managers to rank 12% of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

37. Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (See, e.g. Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

38. The problem with stack rankings is that employees who are objectively meeting

all performance expectations are falsely rated as poor performers.

39. Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

40. At the same time that Capital One's Technology department was implementing stack rankings, it was engaging in a marking, recruiting, and hiring campaign to attract recent college graduates to Capital One.

41. The Technology Development Program, or TDP is what Capital One calls its effort to hire recent college graduates.

42. CIO Alexander has stated that he expects all hires into the Tech department at Capital One to come in through TDP within the next few years.

43. Currently, Capital One's website states that its TDP program is limited only to college graduates from the classes of 2018 to 2020.  (https://campus.capitalone.com/full-time-programs/ visited July 30, 2019).  The website directs anyone who graduated before 2018 to apply for other jobs outside of the TDP program.

44. Last year the TDP was eligible only to college graduates in classes 2017 to 2019. Based on the general age of college graduates between the years of 2017 and 2020, Capital One has been essentially setting its hiring criteria to candidates in their early to mid-20's.

45. While Capital One was using its "performance management" stack ranking policy in furtherance of increasing its "involuntary attrition" rate, Capital One was hiring new employees in their early to mid-20's through the TDP program.

46. In order to make room for the new recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

47. In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the TDP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above and in CIO Rob Alexander's email.

48. Capital One claims to hire the best and brightest associates available.

49. The Requirement that 12 % of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

50. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates.

51. Capital One's termination of Hutchens did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

52. Performance evaluations were typically done once a year, with results coming out in late January for the prior calendar year's performance. There was also a mid-year performance status in June or July, but it was fairly informal. However, around 2017 Capital One began making the mid-year performance process almost as stringent as the year end one.

53. In or around January 2018, Hutchens received a "Strong" performance rating for year 2017.

54. However, in March 2018 Hutchens was informed, out of the blue, that she was no longer meeting expectations and was placed on a "coaching plan."

55. Hutchens disputes that she was a poor performer. Years of prior performance

evaluation ratings at Exceptional, Above Strong, and Strong levels, including her evaluation from January 2018, contradicts Capital One's claim that Hutchens was a poor performer.

56. The coaching plan completed by her supervisor claiming that Hutchens was a poor performer was pretextual and false, and was issued in order to meet Capital One's forced requirement that 12% of employees be placed on coaching plans or PIPs.

57. Hutchens' supervisor contrived bogus reasons to support placing Hutchens on a Coaching Plan. Such fabricated reasons included highly subjective criteria that could not easily be disputed, but was generally devoid of objective metrics. The objective metrics generally showed that Hutchens was in fact performing her job at a strong or very strong level.

58. Specifically, Hutchens met most or all of her deliverables, and her supervisor verbally confirmed this, but in writing stated that Hutchens failed to meet her deliverables.

59. Capital One's justification for Hutchens' poor rating, coaching plan and PIP were false.

60. The supervisor who put Hutchens, age 61, on a coaching plan and PIP, gave another employee, age 57, a poor rating and issued him a coaching plan.

61. Hutchens and the other 57 year old employee are believed to be the two oldest employees subject to performance management by this individual supervisor.

62. Capital One's process and policy of requiring stack rankings, such that 12% of employees must be rated as not meeting expectations, and a subset of those to be involuntarily terminated, is a facially neutral policy that has a disparate impact on employees over age 40.

63. Such policy is an employment termination program under the OWBPA that affects two or more employees.

64. Upon termination of Hutchens, Defendants provided, and Hutchens signed, a

Letter of Agreement ("Agreement") which provided her severance pay in exchange for waiving certain claims against Defendants. The Letter of Agreement is attached as Exhibit 1.

65. Upon termination of Hutchens and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

66. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count 1 – OWBPA

67. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

68. OWBPA claims may not be released.

69. ADEA claims may not be released unless they comply with the OWBPA.

70. Capital One's Letter of Agreement did not comply with OWBPA.

71. The policy alleged herein was an "employment termination program" affecting two or more employees.

72. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

73. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

74. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

75. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the

technology department, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with her claim under the ADEA, including a collective action, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

## Count 2 – ADEA

76. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

77. Capital One discriminated against Hutchens because of her age, 61.

78. Capital One characterized Hutchens' termination as an "involuntary" termination based on performance.

79. Capital One provided Hutchens with a severance in an amount referred to as the "Performance Benefit Structure" which, according to its Associate Severance Plan, applies where "the associate is terminated due to poor performance."

80. The allegation of poor performance was pretextual and false. At the time Hutchens was placed on a coaching plan her most recent performance evaluation was "Strong."

81. The reason given for placing Hutchens on a PIP were pretextual and false.

82. The reasons noted for Hutchens' termination (i.e. poor performance) were pretextual and false.

83. Hutchens' supervisor issued coaching plans to the two oldest employees in her group. Hutchens, at 61, was older than the other employee placed on a coaching plan.

84. But for Hutchens' age, she would not have been placed on a "coaching plan," nor selected for PIP or termination.

85. During this time frame, Capital One CIO Alexander stated in the aforementioned email that "one-third of our organization has not been through a formal calibration." Many of those recent hires were younger employees, including recent college graduates hired through the TDP program. In a 2017 blog post, CIO Alexander stated that "70% of Tech associates joined the company within the past four years…many of these new hires being people leaders – and new to People & Performance Management (PPM) at Capital One."

86. Capital One managers intentionally, or at the instruction of Capital One, did not place younger employees or newer hires in the bottom two "buckets" during its "forced" or "stack" rankings, keeping such younger employees outside of mandatory 12% of employees which formed the pool from which Capital One selected its involuntary terminations.

87. Capital One disparately treated Hutchens and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

88. Capital One's disparate treatment of Plaintiff and older employees was willful.

89. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including TDP hires.

90. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

91. Given Capital One's "best people philosophy," which involves hiring the "best talent in the industry" (per CIO Alexander's blog post of July 19, 2017), Capital One's policy of falsely claiming that 12% of such employees were performing in the bottom two "buckets," and requiring "involuntary" terminations of a subset of that 12%, was implemented willfully with the intent to eliminate employees over 40 years of age.

### Count 3 – Declaratory Relief Regarding Collective Action Waiver

92. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

93. Defendants provided, and Hutchens signed, a Letter of Agreement ("Agreement") which provided her severance pay in exchange for waiving certain claims against Defendants. Ex. 1.

94. The Agreement contains a purported class or collective action waiver.

95. In other cases, Capital One has taken the position that the Agreement prohibits plaintiffs from filing a collective action claim under the FLSA. See *Cortez-Melton v. Capital One*, Case No. 3:19-cv-127-MHL (Docket Nos. 7 and 8); *Petruzzi, et al. v. Capital One*, Case No. 3:19-cv-443-HEH (Docket Nos. 5 and 6).

96. In those cases Capital One filed counterclaims against the plaintiffs in an attempt to recoup the full severance amount it paid under the Agreement, based on asserting collective claims under 29 USC § 216(b). See *Cortez-Melton* (Docket No. 13); *Petruzzi*, (Docket No. 7).

97. Capital One's counterclaims filed above has created a chilling effect on Plaintiff's ability to proceed with a collective action in this matter, for which Capital One may be liable for widespread ADEA violations under disparate treatment and disparate impact claims.

98. The collective action mechanism under the ADEA is the same as that used in the

FLSA, 29 USC § 216(b).

99. Plaintiff is alleging this declaratory action in order to seek a ruling from this Court before proceeding with a collective action and risk facing a countersuit by Capital One.

100. The purported collective/class action waiver issued by Capital One in its Agreement is not permitted by law.

101. OWBPA claims may not be released.

102. ADEA claims may not be released unless they comply with the OWBPA.

103. Capital One did not comply with OWBPA.

104. The OWBPA amended the ADEA to state, "[a]n individual may not waive <u>any right or claim</u> under this Act unless the waiver is knowing and voluntary." 29 USC §626(f)(1) (emphasis added).

105. One of Plaintiff's right under the ADEA is to proceed as a collective action on behalf of herself and others similarly situated pursuant to 29 USC § 216(b). 29 USC § 626(b).

106. As alleged herein, the Agreement is not "knowing and voluntary." Therefore, Plaintiff's right to proceed with a collective action under 29 USC § 216(b) cannot be waived by the Agreement.

107. The purported "class/collective waiver" is a "waiver agreement" under the OWBPA. Such waiver agreement was not "knowing and voluntary," therefore such provision has no effect, and Plaintiff may file a collective action suit under ADEA without breaching such provision.

108. Covenants not to sue under ADEA claims may not be enforced unless the OWBPA is followed. 29 CFR § 1625.23

109. The Agreement, by its terms, does not clearly or unequivocally waive Plaintiff's

right to proceed with a collective action against Capital One under the ADEA.

110. The Agreement is a contract of adhesion.

111. The Agreement was written by Capital One and its attorneys.

112. The Agreement states: "[if] you do not agree to the terms set forth in this Agreement, you will not receive any benefits."

113. The Agreement states that the severance "benefits" paid to Hutchens "are good, valuable and consideration for your promises in this Agreement, including but not limited to the 'General release of Claims.'"

114. The purported class/collective waiver is not a promise by Plaintiff.

115. By the terms of the Letter of Agreement, Capital One intended Plaintiff's ADEA claims to be "subject to release." (Letter of Agreement at p. 2) ("this release includes…the Age Discrimination in Employment Act ("ADEA")). The class/collective wavier applies only to "any claim [] not subject to release." By the terms of its Letter of Agreement, the class/collective waiver language does not purport to waive Plaintiff's right to file an ADEA collective action.

116. Plaintiff seeks declaratory relief from this Court to determine whether the specific purported class/collective waiver language in the Agreement is valid and/or enforceable, or void and/or unenforceable.

117. A justiciable controversy exists between the parties as to whether a collective action waiver in a severance agreement, outside of the context of an arbitration agreement, which purports to waive the right to collective action under the ADEA through 29 U.S.C. § 216(b), is permitted by law; or more specifically, whether the waiver of such right is permitted under the OWBPA where such waiver is not "knowing or voluntary."

118. Separate and apart from the aforementioned justiciable controversy, a justiciable

controversy exists between the parties as to whether the Letter of Agreement itself waived Plaintiffs' right to bring an ADEA collective action under section 29 U.S.C. § 216(b).

119. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain her ability to pursue collective action in this matter in Counts 1 and 2.

120. Plaintiff will only proceed with a collective action upon the Court's granting declaratory relief that the class/collective waiver is void, unenforceable, and/or that Plaintiff will not otherwise be in breach of the Letter of Agreement.

### Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

    A. Issuance of an Order finding that Capital One did not comply with the OWBPA;

    B. Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

    C. Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with her ADEA claim;

    D. Declaring that the "collective action waiver" language of the "Letter of Agreement," which does not include an arbitration provision, is not "knowing and voluntary," unenforceable, and/or otherwise void under the ADEA and OWBPA;

    E. An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

  F. An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who received a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

  G. subject to the Court's determination under Count 1 and/or Count 3 that Plaintiff may proceed with a collective action without breaching the Letter of Agreement, an order granting leave to amend to permit this matter to proceed as a collective action under 29 USC § 216(b);

  H. equitable tolling of, and/or relation back of the statute of limitations for any similarly situated employees who may later join the case should the Court grant the declaratory relief requested in this Complaint;

  I. attorneys' fees; and

  J. any and all further relief permissible by law.

## ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

  A. Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

  B. subject to the Court's determination under Count 1 and/or Count 3 that Plaintiff may bring a collective action without breaching the Letter of Agreement, an order granting leave to amend to permit this matter to proceed as a collective action under 29 USC § 216(b);

  C. equitable tolling of, and/or relation back of the statute of limitations for any similarly situated employees who may later join the case should the Court grant the declaratory relief requested in this Complaint;

  D. money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and the difference in severance benefits between Capital One's "Performance Benefit Structure" which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  E. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations;

  F. pre-judgment and post-judgment interest;

  G. reasonable attorney's fees and costs expended in the prosecution of this case;

  H. any and all further relief permissible by law.

### Relief Requested for Declaratory Judgement

Wherefore, Plaintiff requests the Court grant the following Relief:

  A. entry of an order declaring the class/collective waiver language in the Agreement as either void, illegal, and/or unenforceable; and

  B. an order granting Plaintiff leave to amend her Complaint in accordance with such declaratory relief in order to prosecute this case as a collective action without being in breach of the Letter of Agreement; and

  C. tolling of, and/or relation back of the statute of limitations in light of the declaratory relief requested;

      D.      attorneys' fees pursuant to the ADEA; and

      E.      any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

      Respectfully submitted,
      **Nannette Hutchens**
      Plaintiff

By:____/s/_____
      Craig Juraj Curwood (VSB No. 43975)
      Attorney for Plaintiff
      Curwood Law Firm
      530 E. Main Street, Suite 710
      Richmond, VA 23219
      Telephone: (804) 788-0808
      Fax: (804) 767-6777
      Email: ccurwood@curwoodlaw.com