**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| Nannette Hutchens, | Case No. 3:19-cv-546-MHL |
| Plaintiff, | |
| v. | |
| Capital One Services, LLC; Capital One Financial Corp.; and Capital One, N.A. | |
| Defendants. | |
| Virginia Stirnweis, | Case No. 3:19-cv-637-MHL |
| Plaintiff, | |
| v. | |
| Capital One Services, LLC; Capital One Financial Corp.; and Capital One, N.A. | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' RULE 12(C)**
**<u>MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS</u>**

(CONSOLIDATED BRIEF FILED PURSUANT TO COURT ORDER)

i

## INTRODUCTION

Capital One's argument rests on the faulty premise that because parties can waive the right to proceed collectively in *arbitration*, courts must mechanically bless collective action waivers *in any context*. That premise cannot withstand scrutiny. It rests upon an atextual and ahistorical reading of the relevant legal sources—ignoring the starring role played by the Federal Arbitration Act ("FAA") in cases which, unlike this one, involve agreements to arbitrate. The FAA reflects "a liberal federal policy favoring arbitration agreements." *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). "The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). And the "individualized nature of…arbitration proceedings" is "one of arbitration's fundamental attributes." *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1622 (2018). Therefore, courts may not disregard the terms of an arbitration agreement—including terms requiring arbitration on an individual basis—absent "a clear and manifest congressional command to displace the Arbitration Act." *Id.* at 1624. *These* are the reasons why collective action waivers are typically lawful in the context of arbitration.

But these "considerations change when an arbitration clause is [not] involved." *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 591 (6th Cir. 2014). Without the FAA's "heavy hand in favor of arbitration," *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014), courts must engage in a case-by-case analysis to determine whether a given contractual provision frustrates "the intention of Congress as manifested in the particular statute." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 705 (1945). And there is no question that the collective action waivers Capital One seeks to enforce undermine Congress' remedial designs. *Killion*, 761 F.3d at 591. Congress explicitly incorporated the collective action mechanism into the FLSA and ADEA to "lower individual costs…by the pooling of resources," thereby incentivizing employees to vindicate their statutory rights, and easing the burdens and costs on the courts by encouraging

1

"efficient resolution in one proceeding." *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). These policy concerns, which can be reconciled with similar statutory policies favoring bilateral arbitration, cannot be squared with a regime that allows employers to force their employees into bilateral *court* litigation, with all the costs and burdens that would impose on plaintiffs, the judiciary, and the public.

## ARGUMENT

### I.    Supreme Court and Fourth Circuit Precedent Supports Plaintiffs' Position.

Capital One principally relies on the Supreme Court's trio of decisions in *Gilmer v. Interestate/Johnson Lane Corp.*, 500 U.S. 20 (1991), *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013), and *Epic Systems*, 138 S.Ct. 1612, and the Fourth Circuit's opinion in *Adkins v. Labor Ready, Inc.,* 303 F.3d 496 (4th Cir. 2002). Capital One characterizes those authorities as broadly holding that FLSA, ADEA and other similar statutory rights can be waived by private agreement. Def. Br. at 4-7. Indeed, Capital One carefully avoids any discussion of the FAA, *id.*, and treats the fact that all four cases arose in the context of arbitration as irrelevant to their holdings. *Id.* That characterization is certainly understandable, given that the FAA *must* be deemed irrelevant to those cases' holdings for Capital One to prevail here. But a fair reading of these cases shows that they don't reach nearly as far as Capital One claims. On the contrary, they support Plaintiffs' central thesis that Congress' expressed policy in favor of enforcing arbitration agreements according to their terms was essential to the outcome in all four cases.

### A.    *Gilmer*.

Start with *Gilmer*, which held that ADEA claims may be subject to mandatory arbitration. *Gilmer*, 500 U.S. at 23. *Gilmer* began its analysis with the congressional policies expressed in the FAA, stating that "[i]ts purpose was to reverse the longstanding judicial hostility to arbitration agreements, *id.* at 24, and that its provisions "manifest a 'liberal federal policy favoring arbitration agreements.'" *Id.* at 25 (quoting *Moses H. Cone*, 460 U.S. at 24). In light of the FAA's strong gravitational pull, the Court required the party resisting arbitration to show "Congress intended to preclude a waiver of a judicial forum" through the "text of the ADEA, its legislative history, or an

'inherent conflict' between arbitration and the ADEA's underlying purposes." *Id.* at 26 (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 227 (1987)). The Court stated that "[t]hroughout such an inquiry, it should be kept in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24).

It was in light of this stringent standard that *Gilmer* refused to read a categorical prohibition on arbitration into the ADEA. The Court found that Congress "did not explicitly preclude arbitration or other nonjudicial resolution of claims" when it passed or amended the ADEA. *Id.* at 29. The Court similarly found the congressional policies embodied in the ADEA insufficient to override the FAA, observing that both litigation and arbitration "can further broader social purposes," *id.* at 28, and rejecting the contention that "arbitration will undermine the role of the EEOC in enforcing the ADEA." *Id.* at 29.

The plaintiff in *Gilmer* brought his case as an individual action—not as a putative collective action. *See* Respondents' Br. at 2, 1990 WL 10009098, *Gilmer*, 500 U.S. at 22. Nevertheless, an amicus cited the inadequacy of collective action procedures in arbitration as one reason why ADEA claims allegedly could not be subjected to mandatory arbitration. *Id.* at 21-22.[1] The Court addressed this point only briefly, stating that the issue was not actually raised because the arbitration rules applicable in that case "provide[d] for collective proceedings." *Gilmer*, 500 U.S. at 32. In dicta, the Court went on to observe that "even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." *Id.* (quotations omitted). Even that piece of dicta, though,

---

[1] Capital One's brief to this Court asserts that "[t]he plaintiff [in *Gilmer*] asserted that [his ADEA claim] could not [be subject to compulsory individual arbitration] because arbitration procedures did not provide for collective actions. *Gilmer*, 500 U.S., at 31-32. Thus, the plaintiff argued that the collective action waiver impermissibly abrogated his substantive right to proceed collectively under the ADEA." Br. at 4. Neither statement is accurate. The plaintiff in *Gilmer*, who had filed only an individual claim under the ADEA, did not make either of these arguments.

was closely tethered to the FAA and its attendant policies. The Court characterized the amicus' collective action argument (among others) as a "generalized attack[] on arbitration," "'res[ting] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," and, as such, "'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" *Id.* at 30 (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989)).

In sum, Capital One attempts to elevate a single line of dicta from *Gilmer* addressing a point neither presented nor raised by the parties, divorce that dicta from the governing legal framework supplied by the FAA, and pass it off as binding precedent.

### B. *Italian Colors*.

Capital One's analysis of *Italian Colors*, 570 U.S. 228, is equally deficient. *Italian Colors* presented the question of "whether a contractual waiver of class arbitration is enforceable under the Federal Arbitration Act when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery." *Id.* at 231.

Just as it did in *Gilmer*, the Court began its analysis by taking stock of the strong congressional policies embodied in the FAA. The Court once again reaffirmed that "Congress enacted the FAA in response to widespread judicial hostility to arbitration," *id.* at 232, that "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes,'" *id.* at 233 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985), *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010)), and that courts have no license to invalidate arbitration agreements "unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Id.* (quoting *CompuCredit*, 565 U.S. at 98).

The Court found no contrary congressional command in the antitrust statutes requiring the availability of class action procedures. *Id.* "[A]ntitrust laws," the Court reasoned, "do not guarantee an affordable procedural path to the vindication of every claim." *Id.* Nor do they "'evinc[e] an intention to preclude a waiver' of class-action procedure." *Id.* at 234 (quoting *Mitsubishi Motors*

*Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). The Court found it significant that "[t]he Sherman and Clayton Acts make no mention of class actions." *Id.* Because those antitrust laws "were enacted decades before the advent of Federal Rule of Civil Procedure 23," the Court saw no intent on Congress' part to guarantee a class action right to antitrust plaintiffs. *Id.*

The Court went on to conclude that enforcing the arbitration provision as written would not prevent the "effective vindication" of a federal statutory right. *Id.* at 235. The so-called "effective vindication" doctrine is a "a judge-made exception to the FAA" which holds that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.* (citations omitted). The Court declined to apply the doctrine to the plaintiffs' claims, holding that the effective vindication doctrine would apply only to a "provision in an arbitration agreement forbidding the assertion of certain statutory rights" or "perhaps…filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." *Id.* at 236. In concluding that a class action waiver was not enough to invoke the doctrine, the Court drew an analogy to *Gilmer*, stating that in that case the Court "had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted collective actions." *Id.* at 237. The Court's earlier analysis of Rule 23, together with the Court's discussion of *Gilmer*, suggests that the *Italian Colors* plaintiffs faced an even steeper hill to climb in light of Rule 23's status as a later-adopted non-statutory rule. *Id.*

Citing its recent decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the Court identified an additional hurdle the plaintiffs had failed to overcome. *Concepcion* "invalidated a law conditioning enforcement of arbitration on the availability of class procedure because that law 'interfere[d] with fundamental attributes of arbitration.'" *Italian Colors*, 570 U.S. at 238 (quoting *Concepcion*, 563 U.S. at 344). "[T]he switch from bilateral to class arbitration," the Court said in *Concepcion*, "sacrifices the principal advantage of arbitration—its informality—

and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* (quoting *Concepcion*, 563 U.S. at 348).

The flaws inherent in Capital One's discussion of *Italian Colors* are manifold. Once again, Capital One ignores the essential role played by the FAA in framing the questions for the Court. Both questions asked and answered by the Court—whether the "FAA's mandate has been overridden by a contrary congressional command" and whether the "judge-made exception to the FAA" called the "effective vindication" doctrine was met—are both explicitly creatures of arbitration law. *Id.* at 233, 235. Distinguishing the case even further, *Italian Colors* involved the policies inherent in antitrust law, which are qualitatively different from the congressional policies underlying the FLSA and ADEA. And the plaintiffs in *Italian Colors* claimed a right to the application of Rule 23, a rule which—unlike the FLSA's and ADEA's collective action mechanism—is untethered to the particular statutory rights at issue. Capital One's attempt to cast aside these important distinctions cannot stand.

C.    *Epic Systems.*

The Supreme Court's recent decision in *Epic Systems*, 138 S.Ct. 1612, is even more inapposite. That case again principally concerned the FAA, and presented the question of whether the National Labor Relations Act ("NLRA") contains the sort of "conflicting command" required to override the FAA's "instruct[ion]…to enforce arbitration agreements according to their terms— including terms providing for individualized proceedings." *Id.* at 1619. Once again, the Court recited the now-familiar congressional policies exalting arbitration: Congress' adoption of the FAA "in response to a perception that courts were unduly hostile to arbitration, *id.* at 1621; arbitration's "promise of quicker, more informal, and often cheaper resolutions for everyone involved," *id.*; the "liberal federal policy favoring arbitration agreements," *id.*; and "the [FAA's] require[ment that] courts 'rigorously'…'enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes….'" *Id.* (quoting *Italian Colors*, 570 U.S. at 233). The Supreme Court called these policies "emphatic

6

directions," *id.*, that can be overridden only with "a clear and manifest congressional command to displace the Arbitration Act." *Id.* at 1624.

The Court first held that the FAA's savings clause, which allows courts to refuse to enforce arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, did not justify overriding the arbitration agreements. *Epic Systems*, 138 S.Ct. at 1623. The plaintiffs' proposed "grounds" for "revocation" ran afoul of the Supreme Court's "equal-treatment" rule for arbitration contracts, which holds that while the FAA's savings clause "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,'" *id.* at 1622 (quoting *Concepcion*, 563 U.S. at 339), "the clause offers no refuge for 'defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Id.* at 1622 (quoting *Concepcion*, 563 U.S. at 344). According to the Court, "by attacking (only) the individualized nature of the arbitration proceedings, the employees' argument seeks to interfere with one of arbitration's fundamental attributes." *Id.* "In the Court's judgment, the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace." *Id.* at 1623.

The Court went on to hold that the NLRA contained no contrary congressional command sufficient to override the text and policies of the FAA. *Id.* at 1623-24. The Court explained that the now-familiar "contrary congressional demand" formula derives from bedrock principles of statutory interpretation applicable when a party claims that one act of Congress abrogates another act of Congress. "When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Id.* at 1624 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Conversely, a "party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Id.* (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)). "The intention must be 'clear and manifest,' *id.* (quoting

*Morton*, 417 U.S. at 551), and viewed in light of the "'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 452 (1988)). In the context of the FAA, a contrary congressional command must be unequivocal, direct, and explicit—something akin to "Thou Shalt Not Arbitrate" is required. *Id.* at 1626 (citing 7 U.S.C. § 26(n)(2) ("No predispute arbitration agreement shall be valid or enforceable" in the listed circumstances), 12 U.S.C. § 5567(d)(2) (same), 10 U.S.C. § 987(e)(3) (requiring a party to arbitrate is "unlawful" in certain circumstances)). "[E]ven a statute's express provision for collective legal actions" is not necessarily enough to manifest a contrary congressional command sufficient to override the FAA. *Id.* at 1627 (citing *Gilmer*, 500 U.S. at 32).

In light of these standards, the Court held that Section 7 of the NLRA does not contain a "clear and manifest congressional command to displace the Arbitration Act." *Id.* The NLRA "focuses on the right to organize unions and bargain collectively." *Id.* It does not "express approval or disapproval of arbitration," "mention class or collective action procedures," or "hint at a wish to displace the Arbitration Act." *Id.* This holding is of a piece with the Supreme Court's wider body of arbitration jurisprudence. "In many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected every such effort to date." *Id.* at 1627.[2]

*Epic Systems* is distinguishable for many of the same reasons distinguishing *Gilmer* and *Italian Colors*. Its holdings derive entirely from the FAA. There is no argument here that Plaintiffs seek to discriminate against arbitration "by attacking (only) the individualized nature of the

---

[2] As Capital One points out, the Court observed that the plaintiffs in *Epic Systems did not argue* that the FLSA itself contained a contrary congressional command overriding the FAA and requiring the use of collective action procedures. *Id.* at 1626. Citing the Court's dicta in *Gilmer* and the unanimous view of the circuits, the Court suggested that the FLSA does not contain such a command. *Id.* In light of the Supreme Court's strict formulation of the "contrary congressional command" test and the Fourth Circuit's opinion in *Adkins*, Plaintiffs do not quarrel with the Supreme Court's suggestion. But Capital One is wrong to suggest that *Epic Systems*' discussion of *Gilmer* and circuit precedent sheds any light on the dispute before this Court, which arose outside the context of any arbitration agreement.

arbitration proceedings," thereby "interfere[ing] with one of arbitration's fundamental attributes." *Id.* at 1622. Nor is there cause to inquire whether the FLSA or ADEA contains a "clear and manifest congressional command to displace the Arbitration Act." *Id.* at 1627. That rigorous test, *Epic Systems* tells us, derives from the Court's obligation to do everything it can to reconcile two allegedly competing congressional statutes. *Id.* at 1624. Here, of course, there is no claim that two acts of Congress clash. To the contrary, the Court is faced with little more that an attempt to "exalt autonomy in contract over the laws of the United States." *Govett American Endeavor Fund Ltd. v. Trueger*, 112 F.3d 1017, 1022 (9th Cir. 1997). And last, the Court in *Epic Systems* evaluated the requirements of the NLRA. What the NLRA requires sheds no light on the text, structure, and policies embodied by the FLSA and ADEA.

      **D.**    *Adkins*.

      The Fourth Circuit's decision in *Adkins*, which extended *Gilmer* to hold that FLSA claims can be subjected to mandatory arbitration, *Adkins,* 303 F.3d at 499, does not support Capital One's position either.

      *Adkins* rejected the argument that the "purposes and structure of the FLSA directly conflict with the FAA's pro-arbitration policy." *Id.* at 506. The court treated that issue as a straightforward application of *Gilmer*, noting that "the FLSA's remedial purposes and enforcement scheme are very similar to that of the [ADEA], a statute that the Supreme Court has already concluded does not pre-empt the FAA." *Id.* (citing *Gilmer*, 500 U.S. at 23). The court's rejection of any "direct[] conflict" between the FLSA and the FAA, of course, flowed entirely from the FAA's stated text and policies: the FAA's "liberal federal policy favoring arbitration agreements," *id.* at 500 (quoting *Moses H. Cone*, 460 U.S. at 24), and "Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation." *Id.* (citing *Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001)). The court conducted its analysis "mindful of the 'clear federal directive in support of arbitration.'" *Id.* at 500 (quoting Hightower, 272 F.3d at 242). *Adkins* ultimately concluded that the plaintiff's "claims amount to little more than an attempt to undermine repeated pronouncements by Congress and the Supreme Court that federal law incorporates a liberal policy

favoring arbitration agreements," *id.* at 506-07, and remarked that "[a] refusal on our part to heed these pronouncements would be a dereliction of our duty under law." *Id.* at 507.

In a separate section of its analysis, *Adkins* concluded that the particular arbitration clause at issue was not unconscionable under West Virginia law. *Id.* at 501. The plaintiff had argued that the arbitration agreement's "preclusion of class actions" rendered the agreement unconscionable. *Id.* at 502. *Adkins* ultimately found this issue to be "moot" in light of the plaintiff's "failure to carry his burden of proof" on other unconscionability factors. *Id.* at 503. But the court went on to state, in dicta, that "Adkins points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum." *Id.*

*Adkins* controls this case no more than *Gilmer* does—that is, not at all. Here, too, Capital One attempts to elevate a single line of dicta from *Adkins*, divorce that dicta from the governing legal framework supplied by the FAA, and pass it off as binding precedent. Even taken for all it's worth, Capital One takes the dicta out of context. Capital One creatively replaces the phrase "Adkins points to" in *Adkins* with "[a]s the Fourth Circuit concluded, there is," in its brief to this Court—effectively transforming a statement about lawyering into a statement about law. *Compare* Def. Br. at 6-7 with *Adkins*, 303 F.3d at 503. *Adkins*' statement is correct as far as it goes: the employee's principal brief in *Adkins* contained no discussion of the legislative history, text, or structure of Section 16(b) and made only vague and unsupported statements about the policies underlying the FLSA. Appellants' Br., *Adkins v. Labor Ready, Inc.*, No. 01-2304, 2002 WL 34570228, at 40-43 (4th Cir. May 5, 2002). And, of course, the very next line in *Adkins* confirms that the applicable yardstick for determining whether "Congress intended to confer a nonwaivable right to a class action" was the exacting contrary congressional command standard compelled by "the strong congressional preference for an *arbitral* forum." *Adkins,* 303 F.3d at 503.

E.       **Capital One's Other Inapposite Authority.**

The bulk of the remaining cases cited by Capital One suffer from the same flaws. They arose in the context of arbitration and contain analyses—inapplicable here—required to reconcile a conflict between the FAA and other federal statutory law. *See Adams v. Citicorp Credit Servs.*, 93 F. Supp. 3d 441, 450-51 (M.D.N.C. 2015) ("[T]he policy rationale for collective action does not trump the national policy favoring arbitration."); *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326 (11th Cir. 2014) ("After examining the FLSA's text, legislative history, purposes, and these Supreme Court decisions, we discern no 'contrary congressional command' that precludes the enforcement of plaintiffs' Arbitration Agreements and their collective action waivers."); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 357-58 (5th Cir. 2013) (holding, in a case presenting the same issue resolved by the Supreme Court in *Epic Systems*, that "there is no basis on which to find that the text of the NLRA supports a congressional command to override the FAA"); *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004) ("*Gilmer*'s conclusion…applies with equal force to FLSA claims."); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 295-97 (2d Cir. 2013) ("[T]he FLSA does not include a 'contrary congressional command' that prevents the underlying arbitration agreement from being enforced by its terms."); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052-53 (8th Cir. 2013) ("[T]he FLSA contains no 'contrary congressional command' as required to override the FAA."). For the reasons already discussed, these cases do not support Capital One's position.

II.     **The Sixth Circuit's Decision in *Killion* Correctly Concludes that Collective Action Waivers Outside the Arbitration Context Violate Congressional Policy.**

The Sixth Circuit's opinion in *Killion*—the only circuit-level precedent to address the issue before this Court—best explains why the outcome changes when arbitration is not involved.

As explained in Plaintiffs' principal brief, the text, structure, and purpose of the FLSA and ADEA protect a number of mutually reinforcing congressional policies affecting the public interest. They "protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate

commerce." *O'Neil*, 324 U.S. at 706-07. They "prevent private contracts" resulting from "unequal bargaining power," "which endanger[] national health and efficiency and as a result the free movement of goods in interstate commerce." *Id.* They prevent the use of private agreement to "gain an advantage over...competitors." *Killion*, 761 F.3d at 590. They promote Congress' policy of ensuring uniform minimum-pay standards by "lower[ing] individual costs to vindicate rights by the pooling of resources," thereby incentivizing employees to vindicate their rights, and easing the burdens and costs on the courts by encouraging "efficient resolution in one proceeding." *See Hoffmann-La Roche*, 493 U.S. at 170.

Where "no arbitration agreement is present, [there is] no countervailing federal policy that outweighs [these policies as] articulated in the FLSA." *Killion*, 761 F.3d at 592. There is no congressional policy seeking to "reverse the longstanding judicial hostility to arbitration agreements." *Gilmer*, 500 U.S. at 24; *Italian Colors*, 570 U.S. 232; *Epic Systems*, 138 S.Ct. 1621. There is no "liberal federal policy favoring arbitration agreements." *Gilmer*, 500 U.S. at 25; *Epic Systems*, 138 S.Ct. 1621; *Adkins,* 303 F.3d at 500. There is no requirement that "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes," *Italian Colors*, 570 U.S. 233. There is no need to satisfy the "effective vindication" doctrine. *Italian Colors*, 570 U.S. 235; *Epic Systems*, 138 S.Ct. 1621. There is no policy identifying the "individualized nature of the arbitration proceedings" as a "fundamental attribute[] of arbitration.'" *Epic Systems*, 138 S.Ct. 1622. There is no policy prohibiting discrimination against arbitration. *Italian Colors*, 570 U.S. at 238; *Concepcion*, 563 U.S. at 344; *Epic Systems*, 138 S.Ct. 1622. There is no need to reconcile two federal statutes, and therefore no requirement to show "a clear and manifest congressional command to displace the Arbitration Act." *Epic Systems*, 138 S.Ct. 1624; *Italian Colors*, 570 U.S. 233; *Gilmer*, 500 U.S. at 26; *Adkins,* 303 F.3d at 506.

Without these congressional policies favoring individualized arbitration, public policy is no longer "a two-edged sword." *Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO ex rel. Local Union 676*, 171 F.3d 971, 977 (4th Cir. 1999). And the only relevant question

remaining is whether the contractual provision at issue violates public policy and is therefore void and unenforceable. *See, e.g.*, *Woodstock Iron Co. v. Richmond & D. Extension Co.*, 129 U.S. 643, 662 (1889); *O'Neil*, 324 U.S. at 704; Restatement (Second) of Contracts § 178 (1981).

For the reasons stated in Plaintiffs' principal brief, the FLSA's and ADEA's collective action mechanism serves public policies extending far beyond an individual plaintiff's ability to recover lost wages. Permitting employers to secure collective action waivers would unquestionably frustrate Congress' goal of "lower[ing] individual costs to vindicate rights by the pooling of resources." *Hoffmann-La Roche*, 493 U.S. at 170. So too, it would rob the "judicial system [of the] benefits [of] efficient resolution in one proceeding." *Id.* These roadblocks, in turn, would expose "certain groups of the population from substandard wages and excessive hours" by making their claims significantly more costly—if not impossible—to prosecute. *O'Neil*, 324 U.S. at 706-07. Offending employers would impermissibly "gain an advantage over…competitors." *Killion*, 761 F.3d at 590.

**III.    District Court Cases Rejecting *Killion* Are Wrongly Decided.**

Capital One is correct that some unpublished district court opinions have declined to follow *Killion* and have held that, even outside the arbitration context (and without court or Department of Labor approval), collective action rights can be waived.

These cases all contain the same few fundamental flaws. Some just mechanically apply the holdings of the arbitration cases, despite the manifest and manifold differences. *See Lusk v. Serve U Brands, Inc.*, No. 6:17-cv-06451-MAT, 2019 WL 4415122, at *4 (W.D.N.Y. Sept. 16, 2019) ("Although these cases were in [*sic*] decided in the arbitration context, Plaintiffs have offered no argument as to why these cases should not apply…."); *Feamster v. Compucom Sys., Inc.*, No. 7:15-CV-00564, 2016 WL 722190, at *4 (W.D. Va. Feb. 19, 2016) ("[O]ther courts…have upheld clauses that not only waived the employees' right to bring their claims in a judicial forum, but also provided that employees could only pursue individual claims through arbitration. Here, plaintiffs still maintain their right to bring individual claims in a judicial forum. Therefore, the court finds

that the policy considerations behind the FLSA are not impeded in its decision."). For the reasons set forth in the prior section, this is not an assumption that can simply pass by unexamined.

Other courts read the arbitration cases, erroneously, as holding that no congressional public policy supports the FLSA's or ADEA's collective action mechanism in the first place—essentially deeming the FAA's thumb on the scale irrelevant. *See Benedict v. Hewlett-Packard Co.*, No. 13-cv-00119-BLF, 2016 WL 1213985 (N.D. Cal. Mar. 29, 2016) ("[O]ther circuits have found waivers enforceable not because of the strong policy in favor of the FAA, but rather, as discussed above, because the FLSA's text, scheme, and legislative history reveal that the FLSA 'does not set forth a non-waivable substantive right to a collective action.'"); *Mark v. Gawker Media LLC*, No. 13-cv-4347 (AJN), 2016 WL 1271064, at *4 (S.D.N.Y. Mar. 29, 2016) (same); *Dimery v. Convergys Corp.*, No. 4:17-cv-701-RBH, 2018 WL 1471892, at *5 (D.S.C. Mar. 26, 2018) (same). Notably, none of these cases purport to do their own analysis; instead, they claim that the circuit-level arbitration cases have already decided that the FLSA's and ADEA's collective action mechanism does not implicate congressional policy. For example, *Benedict* cited the Eleventh Circuit's opinion in *Walthour* as supporting its position. *Benedict*, 2016 WL 1213985, at *5. But *Walthour*'s reasoning was entirely bound up in arbitration law. *Walthour*, 745 F.3d at 1336 ("§ 16(b) does not contain the requisite contrary congressional command sufficient to override the FAA."). As a second example, *Dimery* stated that "[t]he Fourth Circuit has also determined that there is no suggestion that Congress intended to confer a non-waivable right to a class action under this statute," citing *Adkins*. *Dimery*, 2018 WL 1471892, at *5. But as discussed above, nothing in *Adkins* suggested that the FLSA's collective action mechanism does not implicate important congressional policies. Rather, *Adkins* faithfully applied arbitration doctrine to conclude that the FLSA contained no *contrary congressional command* sufficient to override the FAA. *Adkins,* 303 F.3d at 500. These district courts' analytical shortcut leads them to a mistaken result. *See Killion*, 761 F.3d at 591 (citing cases from other circuits and finding them unpersuasive outside the arbitration context). None of the circuit-level authorities *actually says* that no congressional policies support the FLSA or ADEA. These district courts' contrary reading would also render the

14

pages and pages of analysis on arbitration law contained in the decisions they cite entirely superfluous. *Cf. Bilski v. Kappos*, 561 U.S. 593, 607-28 (2010) (recognizing the familiar "canon against interpreting any statutory provision in a manner that would render another provision superfluous."). And as set forth in Plaintiffs' principal brief, an independent analysis of the relevant congressional policies contradicts these district courts' decisions.

Many of the erroneously decided district court opinions, *see Dimery*, 2018 WL 1471892, at *5; *Benedict*, 2016 WL 1213985, at *5; *Feamster*, 2016 WL 722190, at *4; *Serrano v. Globe Energy Serv., LLC*, No. MO:15-cv-170-RAJ, 2016 WL 7616716, at *5 (W.D. Tex. Mar. 3, 2016), rely on the mistaken procedural-substantive dichotomy, which is itself a creature of arbitration law and no substitute for the traditional test for determining whether a contractual provision violates public policy. None of them apply the relevant test, which requires courts to examine whether "a statutory right conferred on a private party, but affecting the public interest…contravenes the statutory policy." *O'Neil*, 324 U.S. at 704. What's most striking about these opinions is the fact that they rely on an unstated and unexamined assumption—that waiver of rights labeled as *substantive* violates public policy but waiver of rights labeled as procedural does not—to do all the work. But as the Sixth Circuit explained in *Killion* and *Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603 (6th Cir. 2013), "caselaw does not recognize any such distinction." *Boaz*, 725 F.3d at 606. It is not hard to come up with examples demonstrating why. Under Capital One's theory, for example, an employer could use a contractual provision to shorten the FLSA or ADEA statute of limitations to one day, or even one hour. Because such a provision would modify only "procedural" rights, according to Capital One, it must be deemed lawful. The same would be true of a 13-stage, multi-year internal grievance process as a condition precedent for filing suit. Or a requirement that all hearings take place in Guam and all testimony must be in Mandarin in order to be admissible. By the same token, not all "substantive" rights are inherently unwaivable. For example, an agreement that a worker is an independent contractor rather than an employee is considered relevant (if not dispositive) to the question of whether the worker is an "employee" within the meaning of the FLSA. *See Jammal v. Am. Family Ins. Co.*, 914 F.3d 449, 455 (6th Cir.

15

2019). These examples demonstrate the crucial point: what matters is not whether a "right" is characterized as "procedural" or "substantive." What matters is whether the waiver "affect[s] the public interest" and "contravenes the statutory policy." *O'Neil*, 324 U.S. at 704. *See also Boaz*, 725 F.3d at 606; *Killion*, 761 F.3d at 590. None of the district court opinions declining to follow *Killion* even attempt to engage in this analysis.

These decisions' procedural-substantive dichotomy suffers from an additional flaw: it too derives from arbitration case law. Under the mandate of the FAA, arbitration typically supplies its own procedures. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute . . . . It only trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). In the arbitration context, procedural rights are typically found waivable, while substantive rights are not, because that generally accords with the policies expressed by Congress in the competing statutes. *See id.*; *Gilmer*, 500 U.S. at 26. This is merely a useful rule of thumb, though, even in the arbitration context. Waivers of procedural rights can still be void on public-policy grounds even when arbitration is involved. *See Mitsubishi*, 473 U.S. at 637 n.19 (noting circumstances where procedural waivers would be void "as against public policy" even in the arbitration context); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (same); *see also, e.g., Boyd*, 338 U.S. at 264 (holding that the Federal Employers' Liability Act forum-selection clause is non-waivable); *Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co.*, 537 F.2d 648, 654 (2d Cir. 1976) (holding that the forum-selection clause of the Carmack Amendment to the Hepburn Act is non-waivable). And as explained more fully in Plaintiffs' principal brief, the substantive-procedural distinction is wholly inapplicable outside of the arbitration context, where the purpose for which it was drawn does not apply. *See Boaz*, 725 F.3d at 606; *Killion*, 761 F.3d at 590.

## IV.    Capital One's Arguments Regarding the OWBPA Are Unavailing.

Capital One mistakenly argues that the OWBPA, which by its plain terms states that an employee may not waive "any right or claim" under the ADEA unless the employer complies with

the statute's requirements, 29 U.S.C. § 626(f), applies only to substantive rights. Nothing in the text of the OWBPA or the relevant precedent supports such a limitation.

For starters, the plain language of the statute speaks of "any right" under the ADEA. 29 U.S.C. § 626(f). As Captial One states elsewhere in its brief, a "right" can be labeled procedural or substantive. Br. at 10 (citing *Lusk v*, 2019 WL 4415122, at *4 ("[T]he right to proceed collectively is a procedural right….")). Capital One cannot have it both ways, simultaneously labeling Section 216(b) as a "procedural right" in some instances and not a "right" at all in other circumstances.

Capital One reads *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 258 (2009), as limiting the scope of 29 U.S.C. § 626(f) to cover substantive rights only. But that citation overreads *Penn Plaza*. That case also arose in the context of arbitration. The Supreme Court found that 29 U.S.C. § 626(f) posed no barrier to the enforcement of a collectively bargained agreement to arbitrate ADEA claims because "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law." *Id.* at 266. In other words, in *Penn Plaza*, unlike here, the Court had to reconcile the pro-arbitration policies of the FAA and the NLRA with the ADEA and OWBPA. And just as the Court in *Gilmer* held that the presence of these pro-arbitration statutes permits parties to substitute arbitration for certain statutory procedures, the Court in *Penn Plaza* held that the OWBPA could be displaced to honor the congressional policies favoring arbitration so long as no substantive waiver was involved. *Id.*

Outside the context of arbitration, the result is different. The OWBPA's prohibition against waivers of "any right or claim" is sweeping and broad enough to cover the right to bring a collective action when an ADEA claim is brought in a judicial forum. The plain text of the OWBPA reflects a concern for large-scale terminations of a "group or class" or employees— groups that would obviously benefit most acutely from collective actions. *See* 29 U.S.C. § 626(f)(1)(F)-(G). As Judge Jackson explained in *Hammaker v. Brown & Brown, Inc.*, 214 F. Supp.2d 575, 579 (E.D. Va. 2002), cases that "address the enforceability of arbitration agreements

17

wherein employees waived their rights to a judicial forum altogether" through arbitration are distinguishable from cases, like this one, that do not involve arbitration. *Id.* "[T]he proposition that Congress did not explicitly preclude non-judicial resolution of ADEA claims in the OWBPA is not subject to contravention by a finding that the OWBPA applies to waivers of procedural rights." *Id.* at 580. And the language of the OWBPA is clear: "The [OWBPA's] waiver requirements apply to 'any right or claim under this chapter....'" *Id.* (citing 29 U.S.C. § 626(f)(1))." "The term 'any' is defined as 'one or more.'" *Id.* (citing Webster's Third New Int'l Dictionary (1993)). "Thus, the term 'any' is subject to a broad interpretation…." *Id.* Without the contrary command of the FAA, the OWBPA's plain language dictates that "any right" means "all rights under the ADEA, including procedural rights." *Id.*

## **CONCLUSION**

For the reasons stated above and in Plaintiffs' principal brief, the collective action waivers in the Plaintiffs' Letters of Agreement are void and unenforceable and inapplicable to Plaintiffs' claims. The Court should enter declaratory judgment in favor of Stirnweis on Count 2 of her Complaint, and declaratory judgment in favor of Hutchens on Count 3 of hers.


Dated: February 5, 2020                    Respectfully Submitted,

                                           **Nannette Hutchens and**
                                           **Virginia Stirnweis**

                                           Plaintiffs



                                           By:_____/s/_____
                                           Craig Juraj Curwood (VSB No. 43975)
                                           CURWOOD LAW FIRM, PLC
                                           530 E. Main Street, Suite 710
                                           Richmond, VA 23219
                                           Telephone: (804) 788-0808
                                           Fax: (804) 767-6777
                                           Email: ccurwood@curwoodlaw.com

and

Adam W. Hansen, *Admitted Pro Hac Vice*
Eleanor Frisch, *Admitted Pro Hac Vice*
APOLLO LAW LLC
333 Washington Ave North
Suite 300
Minneapolis, MN 55401
Telephone: (612) 927-2969
Email: adam@apollo-law.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5<u>th</u> day of February, 2020, I electronically filed the foregoing

using the Court's CM/ECF system, which will send a notification of such filing (NEF) to the

following:

Rodney A. Satterwhite, Esq.
Christopher M. Michalik, Esq.
Igor M. Babichenko, Esq.
Summer Laine Speight, Esq.
McGuireWoods LLP
Gateway Plaza
800 E. Canal Street
Richmond, Virginia 23219
rsatterwhite@mcguirewoods.com
cmichalik@mcguireoods.com
ibabichenko@mcguirewoods.com
sspeight@mcguirewoods.com

By:   _____/s/_____
Craig Juraj Curwood